# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### Case No. 12-60011-CR-ROSENBAUM/SNOW

UNITED STATES OF AMERICA,

        Plaintiff,

v.

MONICA LEWIS, *et al.*,

        Defendants.

_____/

### ORDER DENYING MOTION FOR NEW TRIAL

      This matter is before the Court on Defendant Monica Lewis's Motion for New Trial [D.E. 530].  The Court has reviewed Defendant's Motion, the Government's Response, and the record.  After careful consideration, the Court now denies Defendant Lewis's Motion for New Trial for the reasons set forth below.

### 1.  Renewal of Defendant's Motion to Suppress Evidence [D.E. 222]

      Defendant Lewis renews her Motion to Suppress Evidence and Fruits of the Poisonous Tree [D.E. 222], which was previously denied by the Court before trial began.  For the reasons stated in the Report and Recommendation of the Honorable Lurana S. Snow [D.E. 346] and in this Court's Order Adopting Judge Snow's Report and Recommendation [D.E. 420], the Court denies the renewed Motion to Suppress and, accordingly, denies the Motion for New Trial as it regards this basis.

### 2.  Testimony of Lamar Bennett

      Defendant Lewis next objects to certain testimony of Lamar Bennett, a cooperating individual

incarcerated in federal prison in an unrelated case.  Specifically, Defendant complains,

> [T]he Government asked questions to obtain hearsay testimony without laying the proper foundation.  The hearsay was not in furtherance of the conspiracy and was not admissible under some other exception to the hearsay rule.  Further, the hearsay directly implicated the Defendant in drug distribution.

D.E. 530 at ¶ 3.  According to Defendant, admission of this testimony violated Defendant's Sixth

Amendment right to confront the witnesses against her.  *Id.*  Defendant further argues that the Court

should have held a hearing because "this statement allegedly made by co-defendant Barbary . . . was

not provided in discovery . . . ."  *Id.*

Although Defendant's Motion does not specifically identify the portion of the transcript to

which Defendant objects, there are only two parts of Bennett's testimony where Bennett mentioned

Lewis and her alleged involvement with the charged drug conspiracy.  First, on the Government's

direct of Bennett, the following discussion occurred:

> Q:    How much was the cocaine going to the west coast?
>
> A:    Once a week, once every two weeks.
>
> Q:    Do you know who, if anyone, made those trips?
>
> A:    Yes, sir.
>
> Q:    Who is that?
>
> A:    Kim Carswell and Monica Lewis

D.E. 468 at 72:15 - :20.  Notably, no one — including Defendant Lewis — objected to this line of

questioning.

The second time that the issue arose occurred on Defendant Lewis's cross-examination of

Bennett:

Q:      You testified about many debriefings, or many meetings that you had with different agents.  I want to talk about the meetings with Agent Weeks. . . .  You never told Agent Weeks anything about Monica's involvement in this case, is that right?

A:      That is incorrect.

Q:      Go ahead and tell me what did you tell Agent Weeks.

A:      He . . . showed me a stack of pictures.  Monica's face was in the pictures.  I had to say I knew her.  When I said I knew her, he asked me what did Monica do, and I hesitated.  Then he was like, "Well, we know most of everything, so you [might] as well be honest, because I will know if you tell me a lie."  I told him the only thing I knew Monica did is whatever Andre told me.  She was across the street.  That meant she was in Naples.

Q:      You never saw Monica doing anything such as possess drugs?

A:      No, Ma'am.

Q:      You never saw Andre give any drugs to Monica and say, "Go do this"?

A:      No, Ma'am.

Q:      You never saw Monica take any large amount of money and try to transport it to another place?

A:      I seen Monica with large amounts of money.

Q:      Nothing related to drug transactions?

A:      Drug transactions, but I am not sure what drug transaction.  If I am over Andre's house, and Monica pulls up, you know, I wasn't there when the drug transaction, or who she went to see.  I don't know about that.  But I know drug money when I see drug money.

Q:      How do you know drug money when you see drug money?

-3-

A:     Large money.

* * * * *

Q:     You never saw Monica get into her car and drive to the west
       coast?

A:     No, Ma'am.

* * * * *

Q:     All that you are testifying today regarding Monica is based on
       what Andre told you?

A:     Yes, Ma'am.

* * * * *

Q:     You never saw Monica do anything.  Everything that you're
       testifying today to this jury is based on your speculation and
       what Andre told you?

A:     Yes, Ma'am.

D.E. 468 at 159:12 - 163:12.  Again, no one objected, and Defendant did not seek to strike the

Government's earlier questioning of Bennett regarding his knowledge of Defendant Lewis's

activities with the drug conspiracy charged in the Indictment.

       Instead, the proceedings continued with the Government's redirect of Bennett, during which

the Government had Bennett clarify that he had not seen Defendant Lewis with cocaine but

reconfirm that he had witnessed her with possession of what appeared to him to be drug money.  *Id.*

at 163:20 - :22.  Once again, Defendant did not object.  Only after the Government concluded its

redirect did Defendant Lewis in any way register any type of objection to the Government's

questioning of Bennett on direct.  At that time, Defendant Lewis stated that she wished to "reserve

on a motion at the end of the day."  *Id.* at 170:20 - :22; *see also id.* at 195:12 - :18.  Later, Lewis

stated that her motion "ha[d] to do with Bennett's testimony regarding hearsay . . . ." *Id.* at 195:15 -

:18; *see also id.* at 279:8 - 282:11 (also relying on hearsay and an alleged discovery violation only

as bases for objection).

Although Lewis objected as the trial was still proceeding, her objection was, nonetheless, not

contemporaneous with her discovery of the allegedly objectionable evidence, and Defendant did not

make state that the objection was based on a constitutional right.  The first time that Defendant

contended that any of Bennett's testimony violated her constitutional rights was in her filing seeking

a new trial.  Thus, the objection is untimely and must be analyzed under the plain-error standard.

*See United States v. Turner*, 474 F.3d 1265, 1275 (11th Cir. 2007) (citations omitted); *see also United

States v. Chaney*, 662 F.2d 1148, 1152, 1152 n.3 (5th Cir. Unit B 1980) (applying plain-error analysis

where defendant objected during trial, but after alleged objectionable occurrence) (citations omitted).

To satisfy the plain-error standard, a defendant must show that "1) there was an error; 2) the error

was obvious; 3) the error affects the defendant's substantial rights; and 4) the error seriously affects

the fairness, integrity or reputation of the judicial proceeding.  *United States v. Raphael*, 2012 WL

3553353, *4 (11th Cir. Aug. 17, 2012) (citing *United States v. Douglas*, 489 F.3d 1117, 1125 (11th

Cir. 2007) (*per curiam*)).

Here, Defendant cannot demonstrate that any error occurred.  The Court construes

Defendant's objection as challenging the lack of a *James* hearing, named for the case *United States

v. James*, 590 F.2d 575 (5th Cir.) (*en banc*),[1] *cert. denied*, 442 U.S. 917 (1979), prior to allowing

Bennett's statements into evidence as statements by a co-conspirator in furtherance of the conspiracy.

_____

[1]Pursuant to *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), opinions
of the Fifth Circuit issued prior to October 1, 1981, are binding precedent in the Eleventh Circuit.

Under *James*, the Government must prove, by a preponderance of the evidence, that (1) "the declarant and the defendant were involved in an existing conspiracy," and (2) "the statement was made in furtherance of that conspiracy." *United States v. Cross*, 928 F.2d 1030, 1052 (11th Cir. 1991) (quoting *United States v. Jones*, 913 F.2d 1552, 1563 (11th Cir. 1990) and citing *Bourjaily v. United States*, 483 U.S. 171, 175 (1987)).  A court may make this determination in a separate pretrial proceeding, or it may exercise its discretion to wait until the close of the Government's case in chief. *Id.*; *see also United States v. White*, 2009 WL 3486057, *5 (S.D. Ga. Oct. 27, 2009) (citing *United States v. Van Hemelryck*, 945 F.2d 1493, 1497-98 (11th Cir. 1991); *United States v. Dyer*, 752 F.2d 591, 595 (11th Cir. 1985); *United States v. Sanchez*, 722 F.2d 1501, 1507 (11th Cir. 1984); *Bourjaily*, 483 U.S. at 180-81; *United States v. Miles* 290 F.3d 1341, 1351 (11th Cir. 2002)).  If the court decides to render the determination during trial, alleged co-conspirators' statements are admitted during the Government's case upon the Government's assurances that the statements will be connected to a conspiracy in which the declarant and the defendant were involved and that the statements were made in furtherance of that conspiracy.  *See United States v. Allison*, 908 F.2d 1531, 1534 n.2 (citing *United States v. Barshov*, 733 F.2d 842, 850 (11th Cir. 1984); *James*, 590 F.2d at 582).  Thus, no error occurred when the Court did not conduct a *James* hearing prior to or during the trial in this matter — particularly where Defendant did not even request such a hearing.

As to the merits of Defendant Lewis's objection, to establish admissibility, the Government can rely on both independent evidence and the content of the challenged statements themselves. *United States v. Allison*, 908 F.2d 1531, 1533-34 (11th Cir. 1990).  Moreover, whether a statement itself furthers a conspiracy is a relatively easy threshold to cross.  "The statement need not be necessary to the conspiracy, but must only further the interests of the conspiracy in some way. . . .

[S]tatements between conspirators which provide reassurance . . . or inform each other of the current status of the conspiracy further the ends of the conspiracy . . . ." *United States v. Siegelman*, 640 F.3d 1159, 1181 (11th Cir. 2011) (citations and internal quotation marks omitted).   Thus, demonstrating by a preponderance of the evidence that a statement meets this "liberal standard" is not difficult. *See id.*

In this case, the evidence established by, at the very least, a preponderance of the evidence, that a conspiracy to traffic in cocaine and oxycodone existed and that, among others, Barbary, Lewis, Carswell, and Bennett were involved.   Carswell pled guilty to her involvement in the scheme, and recorded telephone conversations between Barbary and Lewis, cocaine seized from Lewis's vehicle, video recordings, and other evidence firmly established Barbary and Lewis's participation in the conspiracy.   Bennett himself testified on the stand that Barbary told him when Carswell was transporting drugs so Bennett could watch Carswell's children while she was gone.   D.E. 468 at 162:8 - 163:1.   This is sufficient to establish by a preponderance of the evidence that a conspiracy existed and that at least Barbary, Carswell, Bennett, and Lewis were involved in some way.   In addition, under the liberal standard that applies to the determination of whether a statement was made in furtherance of a conspiracy, Barbary's statements to Bennett regarding Defendant Lewis's whereabouts were in furtherance of the conspiracy.

As to the other prongs of the plain-error analysis, if any error did occur, it was not obvious, as this Court does not conclude even than error happened.   And, even assuming, *arguendo*, that obvious error did occur, such error did not affect Lewis's substantial rights.   Her attorney thoroughly cross-examined Bennett and obtained his admission that his knowledge regarding Lewis's involvement was based solely on what Barbary told him and on his observation of Lewis with what

he believed to be "drug money."  Therefore, the jury was not laboring under a misconception that Lewis advised Bennett that she was involved in drug-trafficking or that Bennett had actually witnessed Lewis carrying any drugs.

Finally, if error occurred, it did not seriously affect the fairness, integrity, or reputation of the judicial proceeding.  The evidence against Lewis was overwhelming:  she was intercepted on telephone communications with Barbary in which she informed Barbary that she was "in trouble" when carrying cocaine in her car and being followed by law enforcement.  On one recording, after she was stopped by law enforcement, she told Barbary that an object was removed from her trunk, and law enforcement witnesses testified that the removed item consisted of a Gain detergent box containing a vacuum-sealed bag of cocaine, surrounded by detergent and cat litter.  In another recording, she suggested that she was about to be caught with cocaine as she traveled between the east and west coasts of Florida.  After Barbary instructed her to dispose of "it," the toilet at the McDonalds bathroom where she was located was heard flushing twice.  In addition, video surveillance shows Lewis's vehicle driving into Co-defendant Jackson's gated neighborhood on the west coast of Florida after a drive of several hours; gate entry records reflect that Monica Lewis entered Jackson's neighborhood; and a woman of Lewis's build is seen leaving her car in the driveway of Jackson's house, entering Jackson's home, and leaving for the east coast again, within about five minutes of having arrived.  In short, there is no serious possibility — let alone a reasonable probability — that striking the very limited testimony that the Government elicited from Bennett about Lewis would have affected the outcome of the trial.  Because Bennett's testimony regarding Barbary's statements were admissible as a co-conspirator's statements in furtherance of the conspiracy, Defendant's claim pursuant to *Bruton v. United States*, 391 U.S. 123 (1968), must

also fail.  *United States v. Archbold-Newball*, 554 F.2d 665, 677 (5th Cir. 1977) (*Bruton* is not violated where the co-conspirator exception to the hearsay rule applies).

Turning to the alleged discovery violation, during the trial, Defendant initially suggested that the Government had violated its discovery obligations by failing to turn over to Defendant Bennett's statements as he testified about Lewis during the trial.  But the Government has indicated that Bennett has made no "statements," as defined under the Jencks Act.  *See* D.E. 537 at 3.  Even so, however, the Government turned over DEA-6 reports regarding relevant interviews of Bennett "well in advance of trial," although it was not required to do so, and during trial, the Government provided Defendants with Special Agent David Weeks's handwritten notes of his interview with Bennett.  To the extent that Bennett might have told the Government that he learned from Barbary that Lewis was driving drugs to the west coast and cash back, if that is not reflected in any Jencks "statement," no violation of Jencks has been shown.

**3.  Government Exhibits 24A through 24E, 25, and 26A through 26YYYY**

Defendant objects to the Court's admission of Government Exhibits 24A through 24E, 25, and 26A through 26YYYY.  Government Exhibits 24A through 24E consist of digital recordings of all communications intercepted over telephone lines for which the Government had obtained wiretap orders.  *See* D.E. 469 at 183:4 - 189:6.  Government Exhibit 25, in turn, is a digital recording of a selection of the communications in Government Exhibits 24A through 24E, which the Government chose to focus on during trial, and Government Exhibits 26A through 26YYYY are the transcriptions of the communications contained in Government Exhibit 25.  *Id.* at 190:1 - 191:7.

Defendant renews the other Defendants' pretrial objection to the admission of Government Exhibits 24A through 24E.  *See* D.E. 247, 248, 263.  The Court has already addressed these

objections in its pretrial orders. *See* D.E. 420; *see also* D.E. 344. Nothing relevant to the analysis has changed, so the Court does not revisit this issue now.

With regard to Defendant's new objection that "no witness actually reviewed all the contents of Exhibit 24A through E so as to be able to authenticate them," D.E. 530 at ¶ 4, Defendant did not raise this objection prior to admission of the exhibits in question, although the Court expressly asked Defendants whether they had any objections. D.E. 469 at 188:24 - 189:5. As a result, Defendant's objection in this regard must be analyzed under the plain-error standard. Here, even assuming for purposes of argument that an error occurred and it was obvious, Defendant has pointed to nothing to indicate the any such error affected her substantial rights or the fairness or integrity of the judicial proceeding. Specifically, Defendant has not identified any portion of Government Exhibits 24A through 24E that was admitted, although no one previously listened to it, that had any impact whatsoever on her conviction or the fairness of her trial. For this reason, her objection in this regard must fail.

As for Defendant's objections to Government Exhibits 25 and 26A through 26YYYY, except to renew pretrial objections to Government Exhibits 24A through 24E, from which Government Exhibits 25 and 26A through 26YYYY are taken,[2] no Defendants objected to the admissibility of

---

[2]Defendant Lewis also objected to the witness's characterization of Government Exhibits 25 and 26A through 26YYYY. The Government witness described Exhibit 25 as "the intercept that are [sic] pertinent to this trial" and Exhibits 26A through 26YYYY as "the actual transcripts of those phone calls." D.E. 469 at 190:6 - :9. *See infra* at Section 4. In addition, Defendant objected to "just handing out everything before the calls," stating that the "actual evidence is the call itself, not the transcript." *Id.* at 192:6 - :10. Thereafter, the Court instructed the jury not to review the transcripts until the particular call to which the transcript related was read. The Court further read the jury the Eleventh Circuit Pattern Jury Trial Instruction Number 3 on transcripts, explaining that the jurors were to evaluate the contents and speakers on the recordings themselves. *See id.* at 193:15 - 194:22. Defendant indicated that the Court's instruction regarding the use of the transcripts would "work for [her]." *Id.* at 192:25 - 193:2. As far as the

-10-

any of these exhibits, even though the Court specifically inquired as to whether any Defendants had any objections to these exhibits. *See* D.E. 469 at 190:22 - 191:7; *see also id.* at 192:6 - :8 ("I understand that an exhibit has been received and we didn't object to it . . . ."). Therefore, once again, Defendant Lewis's current objection must be analyzed under the plain-error standard.

But no error occurred in the admission of these exhibits. The wiretap in its entirety was admitted. In the absence of an objection that the smaller universe of communications contained in Government Exhibit 25 was unfairly incomplete or misleading in its omissions — neither of which was made here, nor has Defendant Lewis suggested as much at this time — there is nothing improper about admitting as a separate exhibit a subset of an already-admitted exhibit. Defendant Lewis has pointed to no authority to the contrary.

## 4.  Agent Sargent's Testimony

Amber Sargent, a special agent with the Drug Enforcement Administration and the case agent in this matter, testified during trial regarding a number of matters. Among other things, in identifying Government Exhibit 25, Sargent described the exhibit as "the intercept that are [sic] pertinent to this trial." D.E. 469 at 190:6 - :9. She further opined as an expert on several occasions about the meaning of certain conversations between the Co-defendants. Defendant objects to both of these parts of Sargent's testimony.

Regarding the first objection, it should have been clear from Sargent's testimony that she was stating what made the calls relevant to her investigation of the case, not that she was somehow instructing the jury regarding the proper way to evaluate the relevancy of specific evidence. Second,

_____

Court can tell, this objection is not related to Defendant's current objections to Government Exhibits 25 and 26A through 26YYYY.

-11-

to the extent that that was not expressly articulated at the time of Defendant Lewis's objection, during Sargent's testimony, the Government asked Sargent what made a particular call "relevant" to her.  D.E. 469 at 197:6 - :8.  Defendant Lewis objected to use of the word "relevan[t]" and requested instead that the phrase "of interest" be used.  *Id.* at 197:9 - :14.  Thereafter, the Government employed the term "of interest," thereby acknowledging that the term "pertinent" was employed originally to describe calls that Sargent deemed pertinent to the investigation.  *Id.* at 197:16.  In addition, Defendant herself played calls from Government Exhibit 24A through 24E other than those included in Government Exhibit 25.  Finally, Defendant had the opportunity to thoroughly examine Sargent regarding the conversations she deemed "pertinent" on numerous occasions.  *See, e.g.*, D.E. 478 at 127:18 - 150:8; D.E. 479 at 41:15 - 52:12; *id.* at 143:1 - 159:13; D.E. 480 at 34:18 - 62:10; D.E. 496 at 196:7 - 209:11; D.E. 498 at 130:8 - 134:2; *id.* at 170:22 - 186:2.  Therefore, nothing about Sargent's testimony regarding the "pertinence" of the communications contained on Government Exhibit 25 warrants a new trial.

As for Defendant's objections to Sargent's expert testimony, Defendant argues that Sargent "should not have been accepted by the Court as an Expert Witness of Coded Language of Drug Conspirators in the South Florida African American Community."  D.E. 530 at ¶ 6.  But Sargent was not admitted as an expert in that field, to the extent that it even exists.  Instead, the Court admitted Sargent as an expert "in drug-trafficking organizations [and] techniques utilized by drug trafficking organizations to go undetected, includ[ing] coded language."  D.E. 469 at 214:17 - 219:4.

To the extent that Defendant can be understood to object to Sargent's expert testimony in the field for which she was admitted as an expert, under Rule 702, Fed. R. Evid., "a witness [may be] qualified as an expert by knowledge, skill, experience, training, or education."  In a district court's

-12-

analysis under Rule 702, the court must take on the role of a gatekeeper, but this role "is not intended to supplant the adversary system or the role of the jury."  *Quiet Tech. DC-8, Inc. v. Hurel-Dubois, UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) (quoting *Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001)).   Under this function, the district court must "ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002).  But "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC-8, Inc.*, 326 F.3d at 1341; *Maiz*, 253 F.3d at 666 (quoting *Alison*, 184 F.23d at 1311).  Thus, the district court cannot exclude an expert because it believes the expert lacks personal credibility.  *Rink*, 400 F.3d at 1293, n.7.  To the contrary, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Tech. DC-8, Inc.*, 326 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596).

Determining whether a witness is qualified to testify as an expert "requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony." *Jack v. Glaxo Wellcome, Inc.*, 239 F. Supp. 2d 1308, 1314-16 (N.D. Ga. 2002).  In other words, a district court must consider whether an expert is qualified to testify competently regarding the matters she intends to address.  *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562-63 (11th Cir. 1998).  This inquiry requires an expert to satisfy a relatively low threshold.  *Martinez v. Altec Indus., Inc.*, 2005 WL 1862677, *3 (M.D. Fla. Aug. 3, 2005) (quoting *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 507 (5th Cir. 1999) ("As long as some reasonable indication of qualifications is adduced, . . . qualifications become an issue for the trier of fact rather than for the court in its gate-keeping capacity"), *superseded by rule on other grounds as recognized in Mathis*

*v. Exxon Corp.*, 302 F.3d 448, 459 n.16 (5th Cir. 2002)); *see also Johnson v. Big Lots Stores, Inc.*, 2008 WL 1930681, *14 (E.D. La. Apr. 29, 2008) (summarizing *Rushing*, 185 F.3d at 507 n.10, as "explaining that after an individual satisfies the relatively low threshold for qualification, the depth of one's qualification may be the subject of vigorous cross-examination").  After the district court undertakes a review of all of the relevant issues and an expert's qualifications, the determination regarding qualification to testify rests within the district court's discretion.  *See Berdeaux v. Gamble Alden Life Ins. Co.*, 528 F.2d 987, 990 (5th Cir. 1976).

Here, the Government satisfied its burden to demonstrate Agent Sargent's qualifications to serve as an expert in the designated field.  Agent Sargent testified that she has six years' experience as a special agent with the DEA, she has worked on two prior wiretaps, she successfully completed agent training, and she served as the case agent in this case, reviewing more than 99 percent of the thousands of communications intercepted over the wiretaps.  She further explained the important role that her knowledge of the investigation plays in decoding language in a particular case.  *See, e.g.*, D.E. 469 at 206:15 - :22; 208:17 - 209:5.

Moreover, the Eleventh Circuit has held that "[t]he operations of narcotics dealers are a proper subject for expert testimony under Rule 702," and that "an experienced narcotics agent" may "help a jury understand the significance of certain conduct or methods of operation unique to the drug distribution business."  *United States v. Garcia*, 447 F.3d 1327, 1334-35 (11th Cir. 2006) (citations and internal quotation marks omitted).  The Eleventh Circuit has likewise recognized as a part of this type of admissible expert testimony expert testimony from an experienced agent regarding "drug codes and jargon."  *United States v. Novaton*, 271 F.3d 968, 1008 (11th Cir. 2001) (citation and internal quotation marks omitted).  That is precisely what Sargent testified to.  Thus,

the Court finds no error in the admission of her testimony opining on the meanings of various statements and words used in the intercepted communications.

### 5.  Government Exhibit 37B

Defendant argues that the Court should grant a new trial because the Court admitted Government Exhibit 37B into evidence, which was an excerpt from Government Exhibit 37A, and "[t]here was no ability to play or review 37A in the Courtroom, thus, no ability to properly cross examine on the contents or the reliability of the exhibit." D.E. 530 at ¶ 7.  According to Defendant, this violated her Sixth Amendment right to confrontation, as well as Rules 1002 and 1003, Fed. R. Evid.  *Id.*

Defendant's claim is factually inaccurate.  Government Exhibit 37A consisted of a Seagate external hard drive containing video surveillance from pole cameras located at 1721 Northwest 155th Street in Miami Gardens and 2534 Northwest 139th Street in Opa-Locka.  D.E. 479 at 166:1 - :6.  During a sidebar regarding Defendant's objections to the admissibility of Government Exhibit 37B, the following exchange occurred:

| | |
|---|---|
| Lewis's Counsel: | One question, can we play 37A in the courtroom? |
| Court: | Why not? |
| Government: | The defense was provided a copy months and months and months ago.  I am assuming they were able to play it on their computers. |
| Lewis's Counsel: | Can we play it? |
| Court: | Why wouldn't you be able to?  It would be in evidence. |
| Lewis's Counsel: | Do we have the ability? |
| Court: | I don't know. |

-15-

| | |
|---|---|
| Government: | They haven't told me they couldn't get into it on their computer.  The defense has had it. |
| Lewis's Counsel: | I don't want to play this game.  Do you see what I am talking about? |
| Court: | No, I don't? |
| Lewis's Counsel: | How are we going to play it? |
| Government: | It's a process.  We have got an IT guy.  It's not that complicated.  I can type up the steps.  You have to have a clean laptop.  The Government did put the defense on notice many months back of which videos that we were going to play. |
| Court: | If you want to play it in cross, you can do so.  I don't know why we have to play the entire thing if there is no objection. |
| Lewis's Counsel: | I want to play certain things that are exculpatory towards my client.  I don't want to be stuck where we can't play it or it's a process. |
| Court: | I don't know what the situation is as far as that goes.  I imagine that the Government brought a computer. |
| Government: | You are going to have to give me a list.  You know how they are filed.  It takes a bit of maneuvering, if you give me a list. |
| Government: | This was provided so many months ago.  We have so many disks.  You could have let us know[]. |
| Lewis's Counsel: | I know what it's like to play that thing.  You have to do back flips. |
| Court: | It's overruled [[referring to Defendant's objection to the admissibility of Government Exhibit 37B)]. |

D.E. 479 at 169:12 - 170:25; *see also* D.E. 479 at 189:14 - 190:9.  As this excerpt shows, the

Government agreed to assist Defendant in playing whichever excerpts from Government Exhibit

37A that she wished to have the jury hear.  Despite this agreement by the Government, Defendant

chose not to play anything from Government Exhibit 37A.  Defense counsel's failure to take advantage of this offer does not somehow render the equipment necessary to review Government Exhibit 37A unavailable.

Moreover, Defendant had a copy of the information contained in Government Exhibit 37A months before trial, and if she wished to play excerpts that she knew that the Government did not intend to play (since the Government advised her of what it anticipated presenting), she could have made her own arrangements to play those excerpts.  Indeed, Defendant filed a motion pre-trial seeking permission to bring her own laptop into the courthouse for use during trial.  *See* D.E. 462. Finally, Defendant points to no portion of Government Exhibit 37A at all that she wished to present to the jury but did not have the opportunity to do.  Therefore, Defendant's objection in this regard does not state a basis for a new trial.

**6.  Government Exhibit 47**

Defendant asserts that the Court should not have admitted Government Exhibit 47, a document certifying that Jackson did not file taxes from 2007 through 2010, because it was irrelevant and its prejudicial effect outweighed its probative value.  Jackson, however, was a charged co-conspirator in this case, and the Government presented evidence that Defendant traveled across the state to bring him cocaine in furtherance of the conspiracy.  While there, Defendant spent approximately five minutes before returning back across the state.

Jackson resided in a gated community with a golf course and numerous other luxuries indicative of a high income, and he owned an expensive vehicle and was found in possession of $20,000 in United States currency when a search warrant was executed at his residence.  Yet Jackson filed no income tax returns.  Evidence of unexplained wealth during an illicit drug trial is relevant

and admissible.  *See United States v. Terzado-Madaga*, 897 F.2d 1099, 1120 (11th Cir. 1990); *United States v. Gopie*, 347 F. App'x 495, 502 (11th Cir. 2009).  Moreover, its probative value is not outweighed by any prejudicial effect it might have.  As a result, Defendant's objection must be overruled.

### 7.  The Redirect of Agent O'Neill

Defendant complains, "During the redirect of Agent O'Neill, the Government asked questions about O'Neill's family and their usage at his home of the internet.  This was not only irrelevant, it was an intentional attempt to deprive the defendant [of] a meaningful cross examination."  D.E. 530 at ¶ 9.

A review of the record reveals that the Government engaged in no improper questioning of O'Neill regarding his family and their usage at home of the Internet.  During direct examination of Agent O'Neill, Government Exhibits 72A, 72B, and 72C were admitted.  *See* D.E. 498 at 56:11- :16.  Government Exhibits 72A and 72B included records of Internet activity on heroin, and Government Exhibit 72C was a print-out of materials from the Supreme Court of the United States dealing with proceeds traceable to illegal drug trafficking.  *Id.* at 56:23 - 57:15.

On cross-examination of O'Neill, counsel for another Defendant asked the following questions:

| | |
|---|---|
| Counsel: | Obviously, since you weren't there, since you don't know when the [computer] search was made, and you presumably weren't in 2600 Garfield Street, you don't know who made that search, correct? |
| O'Neill: | Correct. |
| Counsel: | Do you have a laptop computer at your house? |
| O'Neill: | Yes, Sir. |

| | |
|---|---|
| Counsel: | Do you live alone? |
| O'Neill: | No, Sir. |
| Counsel: | You have family? |
| O'Neill: | Yes, Sir. |
| Counsel: | I assume, you seem like a nice guy, you have friends? |
| O'Neill: | Yes, Sir. |
| Counsel: | Any time you ever have friends come over and use your computer? |
| O'Neill: | I have family come over and use the computer. |

\* \* \* \* \*

| | |
|---|---|
| Counsel: | You would agree with me that people sometimes send people pictures or images, and they download them on their computer, correct? |
| O'Neill: | Correct. |
| Counsel: | That picture wasn't necessarily taken by the person that owns the computer, correct? |
| O'Neill: | Correct. |

D.E. 498 at 62:17 - 64:18.  To this, Defendant added in her cross-examination of O'Neill,

| | |
|---|---|
| Defendant: | Do you know if that computer was generally on all the time and connected to the Internet openly? |
| O'Neill: | No, Sir. |
| Defendant: | Is that something that can be done, you go in and log on to the Internet and then anybody can get in and out? |
| O'Neill: | Are you talking about, like, through Windows? |
| Defendant: | Yeah.  Windows, you long on, you leave your laptop open, anybody can go in and do searches, right? |

-19-

| | |
|---|---|
| O'Neill: | Yes, if the laptop is unlocked, yes. |
| Defendant: | That search is going to come onto whatever domain that person utilizes? |
| O'Neill: | You mean on to the hard drive? |
| Defendant: | Yeah.  Let's say you log in as lizypearls, or whatever you said, correct? |
| O'Neill: | Yeah. |
| Defendant: | You leave it on all day, and people come and go and use it. |
| O'Neill: | Yes. |
| Defendant: | It's not like it shows it's an individual person.  But every single person that utilizes that computer it's going to show as lizypearls? |
| O'Neill: | Right. |
| Defendant: | It could be a guy that just flew in from Eastern Europe for ten minutes, used your computer to do a search about porn, and leaves again and then all of a sudden lizypearls did this search on porn? |
| O'Neill: | That would be a long way to travel to do that, but yes. |

D.E. 498 at 68:7 - 69:10.  On redirect, the Government asked the following:

| | |
|---|---|
| Government: | If you know, does your family come over and look up articles about illegal drugs and Supreme Court decisions about drug trafficking? |
| O'Neill: | Not that I know of. |

*Id*. at 70:14 - :17.  As these excerpts demonstrate, the Government asked the challenged questions in direct response to theories and issues raised for the first time in cross-examination.  There is nothing improper about this.  On the contrary, it is the very purpose and essence of redirect.  Accordingly, Defendant's objection is overruled.

-20-

**8.  Defendant's Request for an Overnight Recess**

Defendant next objects to the Court's decision not to grant an overnight recess in the trial before Defendant Lewis had to testify if she wished to testify.  *See* D.E. 530 at ¶ 10.  According to Defendant, she "advised the Court that she wanted to testify but needed more time with her attorney."  *Id.*  Defendant contends that the Court's ruling was error because "[t]he Court had throughout the trial granted delays to the Government, Jurors, U.S. Marshal[]s and other defense counsel. . . ."  *Id.*

To evaluate Defendant's argument, it is necessary to view it in context.  Defendant Lewis was arrested on the Indictment in this case on January 13, 2012.  *See* D.E. 17.  Her initial appearance occurred on January 17, 2012.  *See* D.E. 38.  At that time, counsel who has represented Defendant since then was appointed.  *See id.*  The case was originally set for trial to begin on March 12, 2012. *See* D.E. 107.  Following the Government's Motion to Continue Trial, the trial was reset for July 16, 2012.  *See* D.E. 129.  Thereafter, on motions filed by two of Defendant's co-defendants, the trial was continued once again until October 9, 2012.  *See* D.E. 299.

Then the case was reassigned to me.  *See* D.E. 300.  On September 13, 2012, the Court conducted a status conference.  *See* D.E. 365.  At the status conference, Government counsel advised the Court that the Government anticipated that trial of its case would require approximately two weeks.  Counsel for Co-defendant Jackson then indicated that he was not available to try the case during the October 9, 2012, setting because he was scheduled to begin trying a six-week trial in front of another judge at the same time.  Thus, the Court inquired of Defendant as to whether she was amenable to try this case after counsel for Co-defendant Jackson completed his six-week trial. Through counsel, Defendant responded that she was not willing to wait and wanted to proceed to

trial as soon as possible.  Therefore, the Court set the trial to begin on October 22, 2012.[3]  *See* D.E. 422.  Because Defendant and Co-defendants filed additional motions just before trial, the Court delayed the trial starting date by one day to allow Co-defendants' motions to be heard on October 22, 2012.  *See* D.E. 439.

On October 22, 2012, Defendant Lewis filed her witness list, naming Julia McGoogan, Giselle Graham, Doris Chandler, Chris Wong, and Arnaldo Vega as potential witnesses [D.E. 464].  Trial then began on October 23, 2012.  During jury selection, the Court advised the venire panel that trial was expected to last about two to three weeks and asked whether anyone had any scheduling conflicts.  One of the jurors who ultimately was selected indicated that he had prepaid for a vacation beginning on November 15, 2012.  The Court reassured that juror that his vacation should not be in peril because the parties expected the case to conclude before that time.[4]

As the trial progressed, the Court repeatedly asked the Government for updates regarding the anticipated remaining length of its presentation, and the Government apprised the Court of how much longer it expected its case to run.  *See, e.g.*, D.E. 480 at 14 - :20.  On November 5, 2012, the Government stated, "I think there is a chance the Government could [rest] late Wednesday [November 7, 2012].  The defense should be prepared for that."  D.E. 496 at 225:13 - :16.  Defendant

---

[3]As explained during the status conference, the Court's schedule would have required the Court to take a recess from trial for the period from October 15 through the 19.  Because the trial was expected to last approximately two weeks, and further, because the Government attorneys prosecuting the case were from several hours outside the district, the Court granted the Government's request to start the trial on October 22, 2012, to avoid the unnecessary expenditure of money associated with a one-week recess in the middle of trial.

[4]This portion of the trial is not currently transcribed, but the Court's recollection is that after so advising the juror, the Court asked the parties to confirm that the Court's understanding was correct, and the parties agreed.

did not express any concerns about being ready to put on her case.

Then, on November 7, 2012, at the end of the day, the Government updated the Court and parties, stating that it had fewer than six witnesses left and that it expected to rest prior to lunch the following day (November 8, 2012) and as early as the mid-morning break. D.E. 497 at 259:14 - :21. Based on this information, the Court asked Defendants whether any of them anticipated putting on any kind of a case. *Id.* at 259:22 - :25. When some Defendants indicated that they intended to present a case, the Court instructed counsel, "Any other witnesses that are anticipated to be called, if you all would please make sure that the arrangements are in place so you can proceed tomorrow." *Id.* at 260:5 - :7. Counsel for Defendant Lewis responded, "We'll notify the Government." *Id.* at 260:8. The Court then emphasized, "Whatever arrangements you need to make." *Id.* at 260:9. Again, Defendant Lewis expressed no concerns about presenting her case the following day.

The next day, on November 8, 2012, the Government stated on the record that it would rest shortly after the lunch break that day. *See* D.E. 498 at 116:11 - :17. Upon receiving this information, the Court asked each Defendant whether he or she intended to present a case. Defendant Barbary stated that he planned to call two witnesses and thought it might require up to an hour. *Id.* at 116:22 - :117:2. Defendant Barnes explained that his case would last between thirty minutes and an hour. *Id.* at 117:6 - :9. Defendants Hartfield and Holt indicated that they would not be presenting cases. *Id.* at 117:10 - :17. Then Defendant Lewis responded that she thought she would need three or four hours to present two or three witnesses. *Id.* at 117:18 - :25. Because Court was scheduled to begin again at 1:40 that day, it should have been obvious to Defendant Lewis before the lunch break that she would be required to present her case later that day. *See id.* at 118:1 - :17. In any case, once again, Defendant Lewis did not express any concerns about being ready to

proceed with her case later that day.

In discussing the afternoon schedule with Defendants, the Court emphasized the importance of "avoid[ing] making these jurors stay any longer than absolutely necessary." *Id.* Then the Court released counsel for an hour-long lunch break.

After the Government and the four Co-defendants rested later in the afternoon of November 8, 2012, the Government recognized Defendant Lewis and asked whether she wished to present a case. At that time, at least forty minutes of scheduled court time remained in the day,[5] and counsel for Defendant asked to approach the bench. Among other matters, Defendant Lewis's counsel advised the Court that Defendant Lewis wanted to address the Court to request additional time. *See* D.E. 498 at 209:7 - :13. Then Defendant Lewis approached the bench and the following exchange ensued:

|  |  |
|---|---|
| Lewis: | I need more time. I need until Monday. I have my subpoenas for my witnesses, and I just got them today. I need to get them by Monday. |
| Court: | Your attorney has indicated that you wish to testify; is that correct? |
| Lewis: | Yes. |
| Court: | Why don't we put you on now and — |

---

[5]Significantly more than forty minutes could have been left, but for Defendant Lewis's counsel's behavior earlier in the day, which appeared to this Court to be stalling. *See, e.g.*, D.E. 498 at 110:2 - 116:2 (asking to conduct cross-examination of Tyler Dean Sanderson after lunch break because Sanderson testified about "a very big exhibit" that was "just going to take some time to go through . . ." and then finishing questioning within six pages); *id.* at 170:20 - 186:2 (asking witness to look through weeks of electronic GPS data on the stand to advise the jury regarding how long Defendant's car was at a certain address and how many times it was at that address, even though counsel knew the answers to these questions and was able to ask in a leading form when the Court expressed concern that Defendant was unnecessarily using the jury's time).

| | |
|---|---|
| Lewis: | I'm not ready now. |
| Court: | Have you discussed that with your attorney?  You all need to put on somebody. |
| Lewis's Counsel: | We don't have anybody. |
| Court: | You told me previously that you discussed this with Ms. Lewis. |
| Lewis: | No, I did speak with someone last night, but they're out of town. |
| Court: | No, I'm saying that you had a chance to discuss whether you wanted to discuss your testimony before with your attorney. |
| Lewis: | We didn't talk about doing it today. |
| Court: | All right, but you talked about doing it, right? |
| Lewis: | Yes, we talked about doing it. |
| Court: | This trial has been going on for three weeks, and you've been here the whole time, right? |
| Lewis: | Yes. |
| Court: | This jury has been sitting here for three weeks.  I'm not going to waste the jury's time.  You need to put somebody on. |

D.E. 498 at 209:7 - 210:16.  At this point, inexplicably, counsel for Defendant Lewis and Defendant Lewis left the courtroom.  When co-counsel for Defendant Lewis brought them back into the courtroom, the Court held another sidebar with Defendant Lewis's counsel and Defendant Lewis. Among other things, Defendant Lewis's counsel stated, "[Defendant Lewis is] nervous.  She doesn't want to take the stand today. . . ."  *Id.* at 212:1-:2.  The Court provided Defendant Lewis with the opportunity to present other witnesses first, but Defendant Lewis stated that she had no one ready. Therefore, the Court explained,

> The case has been set for several weeks. Everybody knew it was going on October 23rd, and in fact, it was supposed to go on the 22nd. I gave you an extra day. Beyond that, the Government has been checking. I've been saying you better be ready to put on a case. You're telling me that you didn't even put out the subpoenas. You want to testify, but you're saying that you're not ready today. I'm not going to force you to go. Obviously, it's a choice that you make. If you want to testify, you have the time now, and today is when you need to do it. I leave that to you. You can discuss it for another minute or two. You've had a lot of time to talk to your attorney. We've been making this jury wait for a long time.

D.E. 498 at 212:15 - 213:3. Following this lengthy series of sidebars, Defendant announced that she was resting. *Id.* at 213:6 - :7.

While the Court appreciates that Defendant Lewis was nervous about testifying, that is not a basis for delaying trial where more than nine months elapsed between Defendant's initial appearance and the trial in this matter; Defendant insisted on proceeding during the October 22, 2012, trial setting; trial had been ongoing for nearly three weeks when Defendant was asked to present her case; the Court had provided Defendant with repeated advance warnings that she needed to be prepared to present her case. This is especially true where, as here, the jury was instructed at the outset of trial that trial was expected to last two to three weeks, and Defendant was asked to present her case on the last trial day of the third week of trial. Recessing early on November 8, 2012, unnecessarily risked losing at least one juror who had already invested three weeks of his time in the case. In addition, another juror advised the Court that she would be unavailable for trial on November 15, 2012, thus requiring the Court either to dismiss both jurors and continue with no alternates on November 15, 2012, or to recess into the following week and risk losing other jurors who had not cleared their schedules that week because the Court had advised the jury that trial was expected to last only two to three weeks.

It is simply disrespectful to expect fourteen jurors who had expended three weeks of their own time sitting on this case to be available whenever Defendant might have decided that she felt ready to testify.   Our jury system is the engine that makes our criminal-justice system work. Members of the community give of their time, receiving nominal pay and often foregoing work wages, to perform their civic duty.  We need our citizens to remain willing to serve jury duty.  As the American Judicature Society has explained, "The decisions made by juries affect people's . . . right to freedom, or even to life.  Justice depends on the quality of the jurors who serve.  The willingness of all who are summoned to serve is essential to ensure representative, impartial juries . . . ."  http://www.ajs.org/jc/faq/jc_faq_importance.asp (last visited Dec. 11, 2012).  For these reasons, it is not surprising that the American Bar Association has issued its Principles for Juries and Jury Trials (2005) ("ABA Principles"), calling for the time required of people to perform their jury service to be "the shortest period consistent with the needs of justice" and for courts to "respect jurors' time . . . ."  *Id.* at Principles 2.C. and 2.D.  The ABA has likewise expressed its view that "[d]uring trial and deliberations, a juror should be removed only for a compelling reason. . . ."  *Id.* at Principle 8.

Here, Defendant Lewis presented no reason justifying a recess that would have delayed the trial even further beyond the three-week period of which jurors were originally advised and that was likely to cause jurors who had already invested significant time in the proceedings to have to be removed from the jury.  While it is natural to be nervous about testifying, that does not justify these consequences — particularly in view of the fact that Defendant was likely to have been nervous about testifying whether her testimony occurred on November 8, 2012, or instead on November 13, 2012, as she requested.  Defendant was presented with a fair opportunity to testify if she wished to

-27-

do so and chose not to.  She may not now use her own decision as a basis for a new trial.

Nor do the other "continuances" to which Defendant refers warrant a different conclusion. With regard to jurors, the Court recessed two days: one day because a juror had to undergo an emergency medical procedure for a serious condition, *see* D.E. 468 at 142:8 - :22; *id.* at 195:21 - 196:8, and the other because it was a national election day, and one of the jurors who had served as a polling-place worker for thirty years was scheduled to report for such service for this election.  D.E. 6:8 - :24.  Both of these circumstances are entirely distinguishable from Defendant's request for a recess.  First, unlike Defendant Lewis, the jurors made the request prior to the dates on which they sought to recess.  Second, the jurors' reasons for requesting recesses were beyond their control: the first juror could not have prevented the need for an emergency medical procedure, and the national election that the second juror needed to serve as a poll-worker for was scheduled many years in advance.  Third, the reasons for the jurors' requests — a medical emergency and performing another civil duty — provided good cause, whereas Defendant Lewis's reason — that she was nervous — did not.

As for the Court's decision to recess trial eight minutes early one day, counsel for Defendant Barbary appeared flushed and requested a recess because he felt that he was about to pass out as a result of illness.  *See* D.E. 496 at 224:8 - 225:12.  Indeed, he even had to take a seat during the sidebar where he sought the recess.  *Id.*  The resulting recess caused the Court to dismiss the jury at 5:22 p.m. — eight minutes early.  *See id.*  As with the jurors' continuances and unlike Defendant Lewis's request, Barbary's counsel's request was based on good cause and fell beyond his control.

With regard to the Government's requested continuance, as explained *supra* at note 3, trial in this matter was originally slated to begin on October 9, but because the Court had a prior

commitment for the week of October 15 through 19 and could not conduct trial that week, the Court granted the Government's request to begin trial the week of October 22, 2012, and, thus, avoid a one-week recess during the trial.  Unlike Defendant Lewis's request, that request did not lengthen the trial or delay it once it had begun.  And like the other granted continuances but unlike Defendant Lewis's request, the Government presented good cause for the resetting: increased cost to the taxpayers as a result of the out-of-town prosecution team's need to return home in between the first and second weeks of trial.  Finally, the Court does not recall any recesses requested by the Marshals Service.

**9.  The Government's Rebuttal Close**

Next, Defendant asserts that the Court "erred by allowing the Government in rebuttal close to go into areas outside the scope of the Defendant's close."  The Court disagrees that the Government presented any argument on rebuttal outside the scope of the five Defendants' closings and therefore overrules Defendant's objection.

**10.  The Anti-Gratuity Statute**

Finally, Defendant claims that the Government bestowed an unlawful benefit on Kim Carswell and Robert Lespinasse in exchange for their testimony.  D.E. 530 at ¶ 12.  More specifically, Defendant argues that "[a]t the time Ms. Carswell and Mr. Lespinasse entered a plea, the Court was required to remand them to the Marshal[]'s custody.  The Government did not do so, thus, an unlawful benefit was conferred."  *Id.*

The problem with Defendant's contention in this regard arises first from the fact that it was not within the Government's power to release or remand Carswell and Lespinasse.  While it is true that the Government could have recommended to or even moved the Court to release Carswell and

Lespinasse pending sentencing, only the Court had the authority to actually release or remand them.[6]

Moreover, a Government prosecutor cannot violate the Anti-Gratuity Statute, 18 U.S.C. § 201(c)(2),

by conferring leniency on a cooperating defendant in connection with that person's testimony at a

criminal trial.  *See United States v. Lowery*, 166 F.3d 1119, 1124 (11th Cir. 1999) ("[W]e hold that

agreements in which the government trades sentencing recommendations or other official action or

consideration for cooperation, including testimony, do not violate 18 U.S.C. § 201(c)").

To the extent that Defendant's complaint can be construed to suggest some type of *Giglio*

violation, it was a matter of public record in this very case that Carswell and Lespinasse were not

remanded by the Court upon their changes of plea many months before trial.  D.E. 126; D.E. 149.

Indeed, Defendants even cross-examined both Carswell and Lespinasse about the fact that they were

not in custody.  *See* D.E. 469 at 111-12; D.E. 493 at 95.

In short, Defendant has presented no basis for a new trial.  Defendant Monica Lewis's Motion

for New Trial [D.E. 530] is therefore **DENIED**.

**DONE AND ORDERED** at Fort Lauderdale, Florida, this 11th day of December 2012.

ROBIN S. ROSENBAUM
UNITED STATES DISTRICT JUDGE

copies:      The Honorable Lurana S. Snow
                Counsel of Record

---

[6]As these events occurred before the case was transferred to me, I am not aware of the actual circumstances that resulted in the Court's decision to release Carswell and Lespinasse. Nevertheless, it is beyond debate that the Government could not have effected the release of these individuals.